Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Michael Vanunu (MV 4167)
Philip P. Nash (PN 0519)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                              Plaintiffs,

        -against-

CAVALLARO MEDICAL SUPPLY, INC.,
YEVGENIY OVSYANNIKOV, and JOHN DOE
DEFENDANTS 1-10,

                          Defendants.
-----------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.     This action seeks to recover more than $584,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise

non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through Defendant Cavallaro Medical Supply, Inc. ("Cavallaro").

2.     Cavallaro is a retailer of DME and OD that is owned, operated and controlled by Yevgeniy Ovsyannikov ("Ovsyannikov"). In short, Ovsyannikov devised a scheme in conjunction with others who are not readily identifiable to GEICO to obtain prescriptions from various healthcare providers (the "Referring Providers") in order to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly providing Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

3.     Based upon prescriptions for Fraudulent Equipment issued by the Referring Providers, Cavallaro and Ovsyannikov (collectively the "Defendants") allegedly provided Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

4.     GEICO seeks to recover more than $584,000.00 that has been wrongfully obtained by the Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,260,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Cavallaro because:

    (i)    The Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable;

    (ii)    The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent that any Fraudulent Equipment was provided – pursuant to prescriptions purportedly issued by the Referring Providers as a result of predetermined fraudulent protocols,

which were solely to financially enrich the Defendants and others not presently known rather than to treat the Insureds;

(iii)    The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds.

(v)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

5.    The Defendants fall into the following categories:

(i)    Defendant Cavallaro is a New York corporation that purports to purchase DME and OD from wholesalers, purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including GEICO, for Fraudulent Equipment.

(ii)    Defendant Ovsyannikov owns, operates and controls Cavallaro, and uses the corporation to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)    John Doe Defendants 1-10 are citizens of New York and are presently not identifiable but are associated with the Referring Providers and various multi-disciplinary medical offices where the Prescribing Providers operate from that purportedly treat high-volume of No-Fault insurance patients (the "Clinics"), and who have conspired with the Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

6.    As discussed below, the Defendants always have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)    The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – based upon prescriptions received as a result of unlawful financial arrangements between the Defendants and others who

are not presently identifiable and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(ii)    The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols designed by the Defendants and others not presently identifiable to GEICO – solely to financially enrich the Defendants and others not presently known rather than to treat or otherwise benefit the Insureds;

(iii)    The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(v)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

7.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Cavallaro.

8.    The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9.    Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than January 9, 2019 and the scheme has continued uninterrupted since that time.

10.    As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $584,000.00.

## THE PARTIES

I.      **Plaintiffs**

11.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

II.     **Defendants**

12.     Defendant Cavallaro is a New York corporation with its principal place of business in Brooklyn, New York. Cavallaro was incorporated on January 9, 2019, is owned, operated and controlled by Ovsyannikov, and has been used by Ovsyannikov, with the assistance of others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Ovsyannikov resides in and is a citizen of New York.  Ovsyannikov is not and has never been a licensed healthcare provider. Ovsyannikov owns and controls Cavallaro and entered into unlawful financial arrangements with others who are not presently identifiable in order for Cavallaro to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

16.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

18.     GEICO underwrites automobile insurance in the State of New York.

## I.     An Overview of the Pertinent Laws

### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

19.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

20.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

21.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

22.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

23.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

24.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

25.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

26.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

27.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

28.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services,

using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

29.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

30.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

31.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

32.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

33.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

34.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

35.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

36.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

37.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

(a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not

9

established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2

38.     As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

39.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

40.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

41.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

42.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the

provider shall be the <u>lesser</u> of: (i) 150% of the acquisition cost to the provider; <u>or</u> (ii) the usual and customary price charged to the general public.

43.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." <u>See</u> New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

44.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

45.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised</u>. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

46.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

    (i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)  The prescription for DME or OD is not based any unlawful financial arrangement;

(iii)  The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iv)  The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)  The fee sought for the DME or OD was not in excess of either the Medicaid Fee Schedule or the standard for a Non-Fee Schedule item.

## II.  The Defendants' Fraudulent Scheme

47.  Beginning in or about January 2019, the Defendants masterminded and implemented a complex fraudulent scheme in which Cavallaro was used as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

### A.  Overview of the Defendants' Fraudulent Schemes

48.  Between January 2019 and February 2020, the last month for which Cavallaro submitted new claims to GEICO, the Defendants, through Cavallaro, submitted more than $2,000,000.00 in fraudulent claims to GEICO seeking reimbursement for Fraudulent Equipment. Thereafter, and to the present, the Defendants continued seek collection on the fraudulent claims submitted to GEICO. To date, the Defendants have wrongfully obtained more than $584,000.00 from GEICO, and there is more than $1,260,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO.

49.  Ovsyannikov used Cavallaro to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fee Schedule and Non-Fee Schedule items.

50.  The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the

Referring Providers because of secret agreements with third-party individuals who are not presently identifiable.

51.    Upon information and belief, the Referring Providers purportedly issued prescriptions for Fraudulent Equipment to virtually every Insured that was injured in a motor vehicle accident and treated at a particular Clinic, including: (i) a Clinic located at 3910 Church Avenue, Brooklyn, New York (the "Church Ave Clinic"); (ii) a Clinic located at 625 E Fordham Road, Bronx , New York (the "Fordham Road Clinic"); (iii) a Clinic located at 104 Graham Avenue, Brooklyn, New York (the "Graham Ave Clinic"); and (iv) a Clinic located at1611 East New York Avenue, Brooklyn, New York (the "East New York Ave Clinic"). Many of the prescriptions from these Clinics would be provided to the Defendants in exchange for various forms of consideration from the Defendants.

52.    As part of the scheme, and in a way to maximize the amount of money that the Defendants could obtain from GEICO, and other automobile insurers, the prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers and provided to the Defendants were generic and vague.

53.    Once the Defendants received the prescriptions purportedly issued by the Referring Providers, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions or that differed from the HCPCS Codes that were identified in the prescriptions.

54.    By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was

medically necessary as determined by a Referring Provider, who was licensed to prescribe DME and/or OD.

55.     However, the Defendants tried to maximize the amount of No-Fault Benefits that they could obtain from GEICO, and other automobile insurers, by submitting bills to GEICO that misrepresented the Fraudulent Equipment purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

56.     In a substantial majority of the charges for Fee Schedule items identified in Exhibit "1" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment for Fee Schedule items did not match the HCPCS Codes identified in the bills submitted to GEICO by the Defendants.

57.     As part of this scheme, the Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment that did not contain all the features required by the HCPCS Codes for Fee Schedule items billed to GEICO, to the extent that any Fraudulent Equipment was provided to the Insureds in the first instance.

58.     For example, the Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of Fee Schedule items that could be provided to the Insureds, and then submitted bills to GEICO indicating that the Defendants provided the Insureds with a variation that had a higher than necessary maximum reimbursement rate under the Medicaid Fee Schedule.

59.     However, the Fee Schedule items actually provided did not match the HCPCS Codes identified in the bills to GEICO as the items were of inferior quality and without the specific features required by the applicable HCPCS Codes.

60.     Instead, the Fee Schedule items actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes identified in the bills submitted by the Defendants.

61.     The Defendants engaged in a pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

62.     In furtherance of their scheme to defraud GEICO, and other automobile insurers, the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

63.     In actuality, the bills from the Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

64.     As part of this scheme, the Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds were expensive and high-quality when the Non-Fee Schedule items provided were cheap and poor-quality, and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

65.     In fact, the cheap and poor quality Non-Fee Schedule items provided to the Insureds – again, to the extent that any Non-Fee Schedule item was actually provided – were easily

obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the Defendants.

66.     The Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Non-Fee Schedule items at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

67.     After obtaining the vague and generic prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers, the Defendants would bill GEICO for: (i) Fraudulent Equipment that were not reasonable or medically necessary; (ii) Fraudulent Equipment that were not based on valid prescriptions from licensed healthcare providers; (iii) Fee Schedule items that did not represent the HCPCS codes contained in the bills to GEICO; (iv) Non-Fee Schedule items at grossly inflated reimbursement rates; and (vi) Fraudulent Equipment that were otherwise not reimbursable.

**B.     The Defendants' Illegal Financial Arrangements**

68.     Upon information and belief, in order to obtain access to Insureds so the Defendants could implement and execute their fraudulent schemes and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into illegal agreements with others who are not presently identifiable where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

69.     Since Cavallaro's inception, the Defendants engaged in unlawful financial arrangements with others who are not presently identifiable in order to obtain prescriptions for

Fraudulent Equipment. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

70.     As part of the unlawful financial arrangements, the Defendants would pay thousands of dollars in kickbacks to others, many of whom are not presently identifiable, including fictitious businesses, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

71.     In support of the fact that the Defendants paid thousands of dollars in kickbacks to obtain prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Providers, the Defendants utilized Cavallaro's bank accounts to make payments to entities with no legitimate business operations.

72.     For example, Cavallaro provided checks to A to Z Collections, Ltd. ("A to Z") totaling more than $45,000.00 for no legitimate purpose, as A to Z did not conduct any legitimate business activity at the time the checks were issued, which include the following checks:

(i)     On March 8, 2019, Cavallaro issued check #115 to A to Z in the amount of $4,267.00;

(ii)    On April 6, 2019, Cavallaro issued check #1005 to A to Z in the amount of $3,905.00;

(iii)   On May 3, 2019, Cavallaro issued check #1022 to A to Z in the amount of $6,305.00;

(iv)    On May 31, 2019, Cavallaro issued check #1048 to A to Z in the amount of $5,225.00;

(v)     On June 12, 2019, Cavallaro issued check #1081 to A to Z in the amount of $4,807.00; and

(vi)    On June 26, 2019, Cavallaro issued check #1068 to A to Z in the amount of $5,800.00.

(vii)   On January 8, 2020, Cavallaro issued check #1104 to A to Z in the amount of $7,860.00; and

      (viii)   On January 22, 2020, Cavallaro issued check #1118 to A to Z in the amount of $6,872.18.

73.     In keeping with the fact that the payments from Cavallaro to A to Z were not for any legitimate purpose, A to Z is registered to a residential address in Brooklyn, New York, and had no legitimate operations at the time the payments were issued by Cavallaro because A to Z was dissolved by proclamation filed with the New York State Secretary of State on November 27, 2014, more than four years before Cavallaro started issuing checks to A to Z.

74.     In addition to the payments made to A to Z, and in further support of the fact that that the Defendants paid illegal kickbacks to obtain prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Providers, Cavallaro provided multiple checks to Metra, Inc. ("Metra") for no legitimate purpose as Metra did not conduct any legitimate business activity at the time the checks were issued.

75.     For example, between March and May of 2019, Cavallaro issued checks to Metra totaling more than $22,000.00 for no legitimate purpose.

76.     Similar to A to Z, the payments by Cavallaro to Metra were not for any legitimate purpose because Metra had already been dissolved for almost three years. Metra, which was registered to a residential address in Astoria, New York, was dissolved by proclamation filed within with the New York State Secretary of State on August 31, 2016.

77.     Cavallaro also issued payments, as part of the illegal kickbacks paid to obtain prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Providers, to Optimex, Inc. ("Optimex"). Cavallaro issued multiple checks to Optimex for no legitimate purpose as Optimex did not conduct any legitimate business activity at the time the payments were issued.

78.    For example, between January and July of 2020, Cavallaro issued checks to Optimex totaling more than $27,000.00 for no legitimate purpose.

79.    In keeping with the fact that the payments from Cavallaro to Optimex were not for any legitimate purpose, Optimex had no legitimate operations at the time the payments were issued by Cavallaro because Optimex was dissolved by proclamation filed with the New York State Secretary of State on September 25, 2002, more than 17 years before Cavallaro started issuing checks to Optimex.

80.    The above-mentioned payments by Cavallaro to A to Z, Metra, and Optimex were issued solely in support of the unlawful financial arrangements between the Defendants and others not presently identifiable to GEICO in order to obtain prescriptions for Fraudulent Equipment.

81.    The Defendants were able to perpetrate its scheme with others who are not presently identifiable to defraud GEICO, and other insurers, by – in part – paying illegal kickbacks through dissolved entities, such as A to Z, Metra, and Optimex, because the checks issued by Cavallaro were cashed at local check-cashing facilities.

82.    In fact, multiple checks issued to A to Z and Metra were illegally exchanged for cash at a check-cashing facility in New Jersey – Cambridge Clarendon Financial Service, LLC d/b/a United Check Cashing ("Cambridge Clarendon") – as part of the Defendants' unlawful financial arrangements with  others not presently identifiable to GEICO in order to obtain prescriptions for Fraudulent Equipment.

83.    Virtually all the checks made out to A to Z and Metra that were exchanged for cash at Cambridge Clarendon by an individual named Alla Kuratova, who was previously indicted for recruiting individuals to act as phony patients in connection with an illegal prescription drug trafficking ring.

84.     From approximately May 2017 through May 2021, Kuratova illegally exchanged over $35 million worth of checks, made out to over 1,000 different companies, for cash at Cambridge Clarendon, including A to Z and Metra.

85.     Upon information and belief, the above-mentioned payments are only a fraction of the monies paid by Cavallaro in support of the unlawful financial arrangements between the Defendants and others who are not presently identifiable in order to obtain prescriptions for Fraudulent Equipment.

86.     In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Defendants and others who are not presently identifiable, upon information and belief, Ovsyannikov never met the Referring Providers who purportedly issued prescriptions that were used by the Defendants to bill GEICO. Instead, the prescriptions for the Fraudulent Equipment were procured by Ovsyannikov as a result of arrangements with others who are not presently identifiable.

87.     Also keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful kickback and financial arrangements, and as explained in detail below, the prescriptions were not medically necessary, were provided pursuant to predetermined fraudulent protocols that provided Insureds with predetermined sets of virtually identical Fraudulent Equipment, and often times never actually issued by the Referring Provider.

88.     In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment that were not medically unnecessary and were provided as a result of unlawful financial arrangements, the Defendants: (i) received virtually identical predetermined sets of prescriptions from multiple Referring Providers operating out of the same Clinic; (ii) routinely received prescriptions for Fraudulent Equipment containing photocopied or stamped signatures that were

purportedly issued by but never actually signed, authorized, or otherwise issued by the Referring Providers; and (iii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

89.    In keeping with the fact that, as a result of unlawful kickback and financial arrangements, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by but never actually signed by the Referring Providers, many of the claims identified in Exhibit "1" were based upon prescriptions for Fraudulent Equipment that contained photocopied signatures by Referring Providers, including Quazi Rahman, M.D. ("Rahman") and Muhammad Zakaria, M.D. ("Zakaria").

90.    Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics without any interaction with the Defendants.

91.    For example, when Cavallaro billed GEICO for purportedly providing DME and OD to Insureds who purportedly treated at the Fordham Road Clinic, the Insureds were directed to the receptionists at the Fordham Road Clinic who would directly provide DME and OD to the Insureds, without any involvement or interaction by the Defendants.

92.    In further support that the Fraudulent Equipment was provided without any interaction by the Defendants, statements provided to GEICO by Insureds confirmed that when Insureds were actually provided with Fraudulent Equipment, they received it directly from one of the Clinics, typically from the receptionists, without any involvement from the Defendants, and never received prescriptions for Fraudulent Equipment from a healthcare provider.

93.    For example:

   (i)    On January 31, 2019, an Insured named CD was purportedly injured in a motor vehicle accident. Thereafter, CD received treatment at the Fordham

Road Clinic. During an interview with a GEICO investigator, CD confirmed that: (i) CD received Fraudulent Equipment from the receptionist at Fordham Road Clinic; and (ii) no one followed up with CD regarding his use of the Fraudulent Equipment.

(ii)     On March 15, 2019, an Insured named CJ was purportedly injured in a motor vehicle accident. Thereafter, CJ received treatment at the Church Ave Clinic. During an interview with a GEICO investigator, CJ confirmed that CJ received Fraudulent Equipment in a bag from non-medical personnel at the Church Ave Clinic on two occasions.

(iii)    On March 19, 2019, an Insured named MA was purportedly injured in a motor vehicle accident. Thereafter, MA received treatment at the Fordham Road Clinic. During an interview with a GEICO investigator, MA confirmed that: (i) MA received Fraudulent Equipment from the receptionist at Fordham Road Clinic; and (ii) no one measured MA prior to dispending the Fraudulent Equipment.

(iv)    On March 21, 2019, an Insured named SP was purportedly injured in a motor vehicle accident. Thereafter, SP received treatment at a Clinic located on Hempstead Avenue in Queens, New York. During an interview with a GEICO investigator, SP confirmed that: (i) SP received Fraudulent Equipment directly from a receptionist at the Clinic; and (ii) SP was instructed on how to use the Fraudulent Equipment from the receptionist.

(v)     On April 2, 2019, an Insured named PS was purportedly injured in a motor vehicle accident. Thereafter, PS received treatment at the Church Ave Clinic. During an interview with a GEICO investigator, PS confirmed that PS received Fraudulent Equipment directly from the receptionist at the Church Ave Clinic.

(vi)    On April 16, 2019, an Insured named SH was purportedly injured in a motor vehicle accident. Thereafter, SH received treatment at the Church Ave Clinic. During an interview with a GEICO investigator, SH confirmed that SH received Fraudulent Equipment directly from the receptionist at the Church Ave Clinic.

(vii)   On April 25, 2019, an Insured named AR was purportedly injured in a motor vehicle accident. Thereafter, AR received treatment at the Fordham Road Clinic. During an interview with a GEICO investigator, AR confirmed that AR received Fraudulent Equipment from a receptionist at Fordham Road Clinic.

(viii)  On April 30, 2019, an Insured named MA was purportedly injured in a motor vehicle accident. Thereafter, MA received treatment at a Clinic located on Morris Park Avenue in Bronx, New York.  During an interview

with a GEICO investigator, MA confirmed that MA received Fraudulent Equipment directly from the receptionist at the Clinic.

(ix)     On May 1, 2019, an Insured named CT was purportedly injured in a motor vehicle accident. Thereafter, CT received treatment at a Clinic located on Ralph Avenue in Brooklyn, New York. During an interview with a GEICO investigator, CT confirmed that: (i) CT received Fraudulent Equipment from the receptionist at the Clinic; and (ii) the receptionist instructed CT on how to use the Fraudulent Equipment.

(x)      On August 21, 2019, an Insured named NM was purportedly injured in a motor vehicle accident. Thereafter, NM received treatment at a Clinic located on Southern Boulevard in Bronx, New York. During an interview with a GEICO investigator, NM confirmed that: (i) NM received Fraudulent Equipment from a receptionist at the Clinic; and (ii) no one measured NM prior to dispensing the Fraudulent Equipment.

94.     These are only representative examples. In virtually all the claims for Fraudulent Equipment identified in Exhibit "1", to the extent that the Insureds were actually provided with Fraudulent Equipment, the Insureds received the Fraudulent Equipment directly from the Clinics, without any involvement from the Defendants.

95.     In addition, and as part of their scheme, to the extent that the Insureds were actually provided with the Fraudulent Equipment directly from the Clinics without any involvement from the Defendants, the Defendants virtually always submitted multiple bills to GEICO representing that they delivered Fraudulent Equipment to Insureds over the course of several dates in an effort to keep the individual totals on each bill artificially lower and avoid detection by GEICO.

96.     In all of the claims identified in Exhibits "1", the Defendants falsely represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

**C.      The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

97.      In addition to the Defendants' unlawful financial arrangements, pursuant to agreements with others who are not presently identifiable, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by pursuant to predetermined fraudulent protocols, which were designed to maximize the billing that the Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

98.      In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

99.      Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

100.      In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

101.      To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

102.      However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring

Providers were subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

103.   The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

104.   No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

105.   In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

(i)   an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)   the Insured would be seen either by a Referring Provider;

(iii)   on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;

(iv)   subsequently, the Insured would return to the Clinic for one or more additional evaluations and treatment by other healthcare providers, and would be provided with at least one additional prescription for a predetermined set of DME and/or OD, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and

(v)   at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Defendants to fill and was without any involvement by the Insured.

106.   Virtually all of the claims identified in Exhibit "1" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were

purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

107.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

108.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

109.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

110.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

111.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

112.    If a healthcare provider determines that DME and/or OD is medically necessary after taking into account a patient's individual circumstances and situations, in a legitimate setting,

26

the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed and why.

113.   It is improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibit "1" who treated with a specific Referring Provider would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

114.   It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibit "1" who treated with different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

115.   Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibit "1" that treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment.

116.   While the specific preset prescriptions of Fraudulent Equipment varied based upon the specific Clinic that the Insured visited, there were multiple items of Fraudulent Equipment that were purportedly prescribed to virtually all of the Insureds identified in Exhibit "1" regardless which Clinic the insureds visited.

117.   For example, after the Insureds identified in Exhibit "1" purportedly underwent initial examinations from one of various Referring Providers working at one of many Clinics throughout the New York metropolitan area, the Defendants typically obtained a prescription for

Fraudulent Equipment that included: (i) an eggcrate mattress, dry pressure mattress, or mattress; (ii) a lumbosacral support; (iii) a lumbar cushion; (iv) a cervical or orthopedic pillow; and (v) a bed board.

118.    Frequently, the Referring Providers working at one of the many Clinics would also prescribe additional Fraudulent Equipment of virtually the same type, such as: (i) a heating pad; (ii) a water circulating heat/cold pad with pump; (iii) a cervical collar; and (iv) an orthopedic car seat, i.e. a cushion to use while inside a vehicle.

119.    Even more, after the Insureds identified in Exhibit "1" purportedly underwent follow-up examinations from one of various Referring Providers working at one of many Clinics throughout the New York metropolitan area, the Defendants typically obtained a prescription for Fraudulent Equipment that included: (i) a TENS or EMS unit; (ii) a heat lamp; and (iii) a massager. Frequently, the Referring Providers, would also prescribe a whirlpool.

120.    In addition to prescriptions for Fraudulent Equipment that the Defendants received after the Insureds' purported initial and/or follow-up examinations, the Defendants frequently received one or more prescriptions for certain type of OD such as: (i) a custom-fitted "LSO" with "APL", i.e. a lower back brace; (ii) a cervical traction unit; and/or (iii) a custom-fitted knee or shoulder orthosis.

121.    However, and in keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants to support the charges identified in Exhibit "1" were for medically unnecessary Fraudulent Equipment, and obtained as part of a predetermined fraudulent protocol, many of the prescriptions were purportedly issued on dates that the Insureds never treated with the Referring Providers.

122.    Also in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the Referring Providers all issued similar checkmark-based prescriptions, and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

123.    The multiple checkmark-based prescriptions issued by the Referring Providers to an Insured on the same date was part of a predetermined fraudulent protocol that was designed to allow the Defendants to submit multiple bills to GEICO for Fraudulent Equipment in an effort to artificially lower the total dollar amount submitted on each bill and avoid detection.

124.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – let alone identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibit "1".

125.    In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibit "1" were not medical necessity but were the result of a predetermined fraudulent protocol, the prescriptions typically contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

126.    Even more, and as also explained below in more detail, the charges to GEICO identified in Exhibit "1" were not based upon prescriptions for medically necessary Fraudulent

Equipment because the Defendants purportedly provided Insureds with whatever DME or OD that they wanted, even when the Fraudulent Equipment purportedly provided – and billed to GEICO – was not the item identified in the prescriptions purportedly issued by the Referring Providers.

127.    Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued because of predetermined fraudulent protocols and not based upon medical necessity, many of the prescriptions identified in Exhibit "1" were not actually issued by the Referring Provider listed on the prescription. Instead, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions.

128.    Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued because of predetermined fraudulent protocols and not based upon medical necessity the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

129.    Instead, upon information and belief, the Insureds were provided with Fraudulent Equipment directly from the Clinic's receptionists or delivered directly to Insureds' homes, without any interaction from the Defendants – to the extent that the Insureds actually received any Fraudulent Equipment.

130.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1", the Defendants falsely represented that Fraudulent Equipment were provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically

unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

### 1)   The Predetermined Fraudulent Protocol at Church Ave Clinic

131.   The Church Ave Clinic was one of the Clinics where the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

132.   Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds identified in Exhibit "1" purportedly received treatment at the Church Ave Clinic.

133.   When the Insureds went to the Church Ave Clinic to obtain treatment for their purported motor vehicle accident injuries, the Insureds would see a variety of healthcare professionals who operated out of the Church Ave Clinic.

134.   However, the treatment provided to the Insureds, and other patients, at the Church Ave Clinic was overseen and directed by third-party individuals that are not licensed healthcare providers, not the healthcare providers who purportedly treated the Insureds.

135.   These third-party individuals are not presently identifiable and directed the Insureds' medical care pursuant to predetermined treatment protocols, without regard for medical necessity, and in a manner to maximize the amount of No-Fault Benefits that could be obtained from each Insured.

136.   The unidentifiable third-party individuals were able to oversee and direct the medical care of Insureds and other patients by secretly controlling the various medical professional corporations ("PCs") that purported to operate from the Church Ave Clinic, including controlling

the PCs' finances and bank accounts, when the third-party individuals were not licensed medical professionals.

137.    As part of overseeing and directing the medical care of Insureds and other patients at the Church Ave Clinic, the unidentifiable third-party individuals participated in an unlawful financial arrangement with the Defendants, either directly or through others who are not presently identifiable, where the Defendants were provided with prescriptions for a predetermined set of Fraudulent Equipment that were issued to Insureds as part of a fraudulent protocol.

138.    The unidentifiable third-party individuals were – in part – able to provide the Defendants with prescriptions for Fraudulent Equipment issued to Insureds as part of a predetermined fraudulent protocol by forging the signatures of the Referring Providers at the Church Ave Clinic.

139.    The unidentifiable third-party individuals who controlled the Church Ave Clinic were able to forge the signatures of the Referring Providers at the Church Ave Clinic by: (i) creating signature stamps of the Referring Providers, without authorization from the Referring Providers; and (ii) photocopying the signatures of the Referring Providers.

140.    As such, many of the prescriptions for Fraudulent Equipment originating from the Church Ave Clinic, which were used as the basis to submit many of the charges to GEICO identified in Exhibit "1", were never issued by or authorized by the Referring Providers whose names are identified on the prescriptions.

141.    For example, and in keeping with the fact that the prescriptions purportedly issued by Referring Providers at the Church Ave Clinic were not actually issued or authorized by the Referring Provider whose name is on the prescription, virtually all of the charges identified in

Exhibit "1" that are based upon prescriptions containing Rahman's or Zakaria's name actually contain photocopied or stamped signatures that purportedly belong to Rahman and Zakaria.

142.   The unidentifiable third-party individuals at the Church Ave Clinic, who are not licensed healthcare professionals, issued virtually identical prescriptions for Fraudulent Equipment to the Insureds identified in Exhibit "1" that treated at the Church Ave Clinic using stamped or photocopied signatures to have the prescriptions appear legitimately signed by the Referring Providers when the Referring Providers never issued or authorized the prescriptions.

143.   As part of the predetermined fraudulent protocol where the Insureds and other patients who treated at the Church Ave Clinic were provided with prescriptions for Fraudulent Equipment, each Insured was provided with a prescription for multiple items of Fraudulent Equipment after undergoing a purported initial examination at the Church Ave Clinic.

144.   In keeping with the fact that the prescriptions issued to the Insureds subsequent to their initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, the Referring Providers who purportedly issued the prescriptions never evaluated each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

145.   In further keeping with the fact that the prescriptions issued to the Insureds subsequent to their initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, virtually every Insured who underwent an initial examination at the Church Ave Clinic received a prescription for virtually the same type of Fraudulent Equipment.

146.   Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would

actually use the Fraudulent Equipment, after a purported initial examination at the Church Ave Clinic, the Insureds identified in Exhibit "1" were virtually always prescribed the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; and (vii) a water circulation cold/hot pad.

147.    In addition to the seven items described above, prescriptions from the Church Ave Clinic would also regularly include: (i) an orthopedic car seat (if the Insured was noted to be the driver of the vehicle involved in the accident); and (ii) a cervical collar (2 pcs).

148.    As part of the predetermined fraudulent protocol where prescriptions for Fraudulent Equipment were issued to the Insureds identified in Exhibit "1", if the Insureds returned to the Church Ave Clinic for further treatment, the Insureds would virtually always be provided with at least one or more additional prescriptions for a predetermined set of Fraudulent Equipment purportedly issued by the Referring Providers.

149.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, the Insureds identified in Exhibit "1" that continued treatment at the Church Ave Clinic were virtually always prescribed the following Fraudulent Equipment: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp.

150.    In addition to the items prescribed to virtually every Insured who continued treatment at the Church Ave Clinic, as part of the predetermined fraudulent protocols, the Insureds were also provided with separate additional prescriptions for Fraudulent Equipment that virtually

34

always included at least one of following: (i) a "traction cervical" frame with pump; (ii) a LSO

APL (Custom Fitted); and/or (iii) a shoulder, knee, or ankle support (Custom Fitted).

151.    In keeping with the fact that the prescriptions for Fraudulent Equipment from the

Church Ave Clinic were fraudulently issued by unidentifiable third-party individuals, issued as

part of a predetermined fraudulent protocol, and issued without medical necessity, virtually every

Insured who treated at the Church Ave Clinic was issued at least one prescription for Fraudulent

Equipment that was dated on a day that the Insureds was not examined or otherwise treated by the

Referring Provider who purportedly issued the prescription.

152.    In also keeping with the fact that the prescriptions for Fraudulent Equipment from

the Church Ave Clinic were fraudulently issued by unidentifiable third-party individuals and not

the Referring Providers whose names were on the prescriptions, many of the Insureds identified in

Exhibit "1" received multiple separate prescriptions for Fraudulent Equipment on a single date

that were purportedly issued by the same Referring Provider.

153.    Upon information and belief, multiple separate prescriptions were issued to the

Insureds on a single date, and purportedly by the same Referring Provider, as part of the scheme

between the Defendants and unidentifiable third-party individuals to provide the Defendants with

the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to

lower the amount charged to GEICO on each bill so the Defendants could avoid detection of their

fraudulent schemes.

154.    In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly

issued to Insureds were medically unnecessary and were provided pursuant to a predetermined

fraudulent protocol, there was no legitimate reason for a single Referring Provider to issue multiple

prescriptions for Fraudulent Equipment to a single Insured on the same date, especially when the

prescriptions were ultimately provided to same DME/OD Supplier, *i.e.* the Defendants. The multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription.

155.   There is no legitimate reason why any healthcare provider would need to issue multiple prescriptions to an individual Insured on a single date that was filled by a single DME/OD retailer, including the Defendants. Even more, there is no legitimate reason why this would occur in a substantial amount of the Insureds identified in Exhibit "1" who treated at the Church Ave Clinic.

156.   In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave Clinic were fraudulently issued by unidentifiable third-party individuals, issued as part of a predetermined fraudulent protocol, and issued without medical necessity, the prescriptions issued to the Insureds who treated at the Church Ave Clinic were virtually identical regardless of which Referring Provider purportedly issued the prescriptions.

157.   Even more, the predetermined fraudulent protocols established at the Church Ave Clinic where Insureds were provided with multiple prescriptions for virtually identical Fraudulent Equipment were not isolated to prescriptions provided to the Defendants. In many circumstances, the prescriptions for the Insureds identified in Exhibit "1" were provided to the Defendants and other DME/OD suppliers.

158.   For example:

     (i)     On December 17, 2018, an Insured named EA was purportedly involved in a motor vehicle accident. EA purportedly started treating at the Church Ave Clinic with Rahman on December 17, 2018. After Rahman purportedly performed an initial examination on EA, Rahman purportedly issued a prescription in the name of EA that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot

pad; (viii) a cervical collar (2 pcs); and (ix) an orthopedic car seat. On January 28, 2019, the same day that Rahman purportedly conducted a follow-up examination, Rahman purportedly issued the following prescription in the name of EA that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp. On February 22, 2019, Rahman purportedly issued a prescription in the name of EA for a LSO APL (Custom Fitted) that was provided to the Defendants, despite Rahman not performing any examination or treatment on EA on that day. On March 13, 2019 Rahman purportedly issued a prescription in the name of EA for a cervical traction frame w/ pump that was provided to a different DME supplier, despite Rahman not performing any examination or treatment on EA on that day.

(ii)     On January 15, 2019, an Insured named RE was purportedly involved in a motor vehicle accident. RE purportedly started treating at the Church Ave Clinic with Rahman on January 16, 2019. After Rahman purportedly performed an initial examination on RE, Rahman purportedly issued a prescription in the name of RE that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot pad; and (viii) an orthopedic car seat. On February 25, 2019, the same day that Rahman purportedly conducted a follow-up examination, Rahman purportedly issued the following prescription in the name of RE that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp. Also on February 25, 2019, Rahman purportedly issued two additional and separate prescriptions in the name of RE for: (i) a LSO APL (Custom Fitted); and (ii) an Ankle Support (Custom Fitted) that were provided to the Defendants.

(iii)    On February 5, 2019, an Insured named AW was purportedly involved in a motor vehicle accident. AW purportedly started treating at the Church Ave Clinic with Rahman on February 6, 2019. After Rahman purportedly performed an initial examination on AW, Rahman purportedly issued a prescription in the name of AW that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot pad; (viii) a cervical collar (2 pcs); and (ix) an orthopedic car seat. On March 6, 2019, the same day that Rahman purportedly conducted a follow-up examination, Rahman purportedly issued the following prescription in the name of AW that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp. On March 8, 2019, Rahman purportedly issued two separate prescriptions in the name of AW for: (i) a LSO APL (Custom Fitted); and (ii) a cervical traction frame w/

pump that were provided to a different DME/OD supplier, despite Rahman not performing any examination or treatment on AW on that day.

(iv)     On February 20, 2019, an Insured named NS was purportedly involved in a motor vehicle accident. NS purportedly started treating at the Church Ave Clinic with Rahman on February 20, 2019. After Rahman purportedly performed an initial examination on NS, Rahman purportedly issued a prescription in the name of NS that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot pad; (viii) a cervical collar (2 pcs); and (ix) an orthopedic car seat. On June 3, 2019, a Referral Provider at the Church Ave Clinic named Carlotta Ross-Distin, M.D. ("Ross-Distin") purportedly issued the following prescription in the name of NS that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp, despite Ross-Distin not performing any examination or treatment on NS on that day.

(v)      On February 24, 2019, an Insured named KW was purportedly involved in a motor vehicle accident.  KW purportedly started treating at the Church Ave Clinic with Rahman on February 27, 2019. After Rahman purportedly performed an initial examination on KW, Rahman purportedly issued a prescription in the name of KW that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot pad; (viii) a cervical collar (2 pcs); and (ix) an orthopedic car seat.  On March 11, 2019, Rahman purportedly issued two separate prescriptions in the name of KW for: (i) cervical traction frame w/ pump; and (ii) a LSO APL (Custom Fitted) that were provided to a different DME/OD supplier, despite Rahman not performing any examination or treatment on KW on that day.  On April 1, 2019, the same day that Rahman purportedly conducted a follow-up examination, Rahman purportedly issued the following prescription in the name of KW that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp.

(vi)     On March 13, 2019, an Insured named SP was purportedly involved in a motor vehicle accident. SP purportedly started treating at the Church Ave Clinic with Rahman on March 15, 2019. After Rahman purportedly performed an initial examination on SP, Rahman purportedly issued a prescription in the name of SP that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot pad; and (viii) a cervical collar (2 pcs); and (ix) an orthopedic car seat.  On

April 19, 2019 Rahman purportedly issued a prescription in the name of SP for a cervical traction frame w/ pump that was provided to a different DME/OD supplier, despite Rahman not performing any examination or treatment on SP on that day. On May 8, 2019, the same day that Zakaria purportedly conducted a follow-up examination, Zakaria purportedly issued the following prescription in the name of SP that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp.

(vii)   On March 25, 2019, an Insured named AS was purportedly involved in a motor vehicle accident. AS purportedly started treating at the Church Ave Clinic with Rahman on April 1, 2019. After Rahman purportedly performed an initial examination on AS, Rahman purportedly issued a prescription in the name of AS that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; and (vii) a water circulation cold/hot pad. On April 22, 2019, Rahman purportedly issued a prescription in the name of AS for a LSO APL (Custom Fitted) that was provided to the Defendants, despite Rahman not performing any examination or treatment on AS on that day. On May 8, 2019, the same day that Zakaria purportedly conducted a follow-up examination, Zakaria purportedly issued the following prescription in the name of AS that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp.

(viii)   On April 22, 2019, an Insured named ML was purportedly involved in a motor vehicle accident. ML purportedly started treating at the Church Ave Clinic with Zakaria on April 26, 2019. After Zakaria purportedly performed an initial examination on ML, Zakaria purportedly issued a prescription in the name of ML that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot pad; and (viii) a cervical collar (2 pcs). On May 8, 2019 Zakaria purportedly issued a prescription in the name of ML for a cervical traction frame w/ pump that was provided to the Defendants, despite Zakaria not performing any examination or treatment on ML on that day. On May 22, 2019, Zakaria purportedly issued a prescription in the name of ML for a Shoulder Support (Custom Fitted) (right) that was provided to the Defendants, despite Zakaria not performing any examination or treatment on ML on that day. On May 31, 2019, Zakaria purportedly issued a prescription in the name of ML for a Shoulder Support (Custom Fitted) (left) that was provided to the Defendants, despite Zakaria not performing any examination or treatment on ML on that day. On June 3, 2019, a Referring Provider at the Church Ave Clinic named Craig Wilkerson, M.D. ("Wilkerson") purportedly issued the following prescription in the name of ML that was provided to the

Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp, despite Wilkerson not performing any examination or treatment on ML on that day.

(ix)     On May 8, 2019, an Insured named RC was purportedly involved in a motor vehicle accident. RC purportedly started treating at the Church Ave Clinic with Zakaria on May 15, 2019. After Zakaria purportedly performed an initial examination on RC, Zakaria purportedly issued a prescription in the name of RC that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot pad; (viii) a cervical collar (2 pcs); and (ix) an orthopedic car seat.  On July 8, 2019, a Referring Provider named Olga Gibbons, M.D. ("Gibbons") purportedly issued the following prescription from the Church Ave Clinic in the name of RC that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp, despite Gibbons not performing any examination or treatment on RC on that day.

(x)      On May 9, 2019, an Insured named DC was purportedly involved in a motor vehicle accident. DC purportedly started treating at the Church Ave Clinic with Zakaria on May 10, 2019. After Zakaria purportedly performed an initial examination on DC, Zakaria purportedly issued a prescription in the name of DC that was provided to the Defendants that included the following Fraudulent Equipment: (i) an orthopedic pillow; (ii) a lumbar cushion; (iii) a lumbosacral support (LSO); (iv) a thermophore; (v) an egg crate mattress; (vi) a bed board; (vii) a water circulation cold/hot pad; (viii) a cervical collar (2 pcs); and (ix) an orthopedic car seat.  On June 12, 2019, the same day that a Referring Provider named Alford Smith, M.D. ("Smith") purportedly conducted a follow-up examination at the Church Ave Clinic, Smith purportedly issued the following prescription in the name DC that was provided to the Defendants: (i) an EMS unit; (ii) an EMS belt; (iii) a massager; and (iv) an infrared lamp.  On June 14, 2019, Smith purportedly issued three separate prescriptions in the name of DC for: (i) a LSO APL (Custom Fitted); (ii) a cervical traction frame w/pump; and (iii) a Shoulder Support (Custom Fitted) that were provided to a different DME/OD supplier, despite Smith not performing any examination or treatment on DC on that day.

159.   These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Church Ave Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

160.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Church Ave Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Church Ave Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

161.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave Clinic were the result of a predetermined fraudulent protocol, the prescriptions for Fraudulent Equipment provided to patients at the Church Ave Clinic were not isolated to the Insureds identified in Exhibit "1".

162.    Instead, patients who sought treatment at the Church Ave Clinic subsequent to a motor vehicle accident, including Insureds, received prescriptions for Fraudulent Equipment that are virtually identical to the above-described examples, which were then provided to one of multiple DME/OD suppliers.

163.    For example, and in keeping with the fact that the prescriptions for Fraudulent Equipment were the result of a predetermined fraudulent protocol, prescriptions for Fraudulent Equipment that are virtually identical to the prescriptions described above were issued to Insureds who treated at the Church Ave Clinic and then provided to another DME/OD supplier entitled Longevity Medical Supply, Inc. ("Longevity").

164.    GEICO previously sued Longevity in an action entitled Gov't Emps. Ins. Co., et al. v. Longevity Med. Supply, Inc., et al., 1:20-cv-01681-RPK-VMS (E.D.N.Y.), in which GEICO alleged, like the allegations here against the Defendants, that Longevity was obtaining

prescriptions for Fraudulent Equipment from the Church Ave Clinic pursuant to unlawful financial arrangements and pursuant to a predetermined fraudulent protocol.

165.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of a predetermined fraudulent protocol and not based upon prescriptions for medically necessary DME/OD, the prescriptions for Fraudulent Equipment that the Defendants obtained from the Church Ave are virtually the same as the prescriptions for Fraudulent Equipment that Longevity received from the Church Ave Clinic.

166.     In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave Clinic that were used to support the charges identified in Exhibit "1" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneous dated medical records, such as an initial examination report or a follow-up examination report, virtually never identified all of the Fraudulent Equipment purportedly prescribed to the Insureds.

167.     Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports did not contain any sufficient information to explain why any of the Fraudulent Equipment was prescribed.

168.     To the extent that the contemporaneous reports issued by Referring Providers at the Church Ave Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports virtually never contained any specific detail explaining why the Fraudulent Equipment was prescribed to the Insured.

169.     Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave Clinic were not medically necessary and were issued pursuant to

a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

170. In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

171. However, the follow-up examination reports from Referring Providers at the Church Ave Clinic failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

172. Additionally, as part of the fraudulent scheme between the Defendants and unidentified third-party individuals, the prescriptions from the Church Ave Clinic were never given to the Insureds but were routed directly to the Defendants, or other DME/OD suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Church Ave Clinic, without any interaction with or instruction concerning their use from either the Defendants or a healthcare provider.

173.    Also as part of the fraudulent scheme between the Defendants and unidentified third-party individuals, the prescriptions from the Church Ave Clinic were purposefully generic and vague to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

174.    By way of example, the prescriptions do not specify a type of cervical collar or lumbosacral support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code. Instead, the prescriptions from the Church Ave Clinic containing the phrases "cervical collar (2 pcs)" and "lumbosacral support (LSO)", which provide the Defendants with the ability to select a specific type of support that was more highly priced and profitable.

### 2)    The Predetermined Fraudulent Protocol at Fordham Road Clinic

175.    The Fordham Road Clinic was another one of the Clinics that the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

176.    Similar to the Church Ave Clinic, subsequent to their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds identified in Exhibit "1" purportedly received treatment from a variety of healthcare professionals at the Fordham Road Clinic.

177.    However, the treatment provided to the Insureds, and other patients, at the Fordham Road Clinic was overseen and directed by third-party individuals that are not licensed healthcare providers, not the healthcare providers who purportedly treated the Insureds.

178.    These third-party individuals are not presently identifiable and directed the Insureds' medical care pursuant to predetermined treatment protocols, without regard for medical necessity, and in a manner to maximize the amount of No-Fault Benefits that could be obtained from each Insured.

179.    As part of overseeing and directing the medical care of Insureds and other patients at the Fordham Road Clinic, the unidentifiable third-party individuals participated in an unlawful financial arrangement with the Defendants, either directly or through others who are not presently identifiable, where the Defendants were provided with prescriptions for a predetermined set of Fraudulent Equipment that were issued to Insureds as part of a fraudulent protocol.

180.    As part of the unlawful financial arrangements with the Defendants, the unidentifiable third-party individuals were able to provide the Defendants with prescriptions that were issued as part of a predetermined fraudulent protocol, and without medical necessity, because the prescriptions, as provided to the Defendants, were not authorized by the Referring Providers whose names were on the prescription forms.

181.    The unidentifiable third-party individuals were able to provide Defendants with prescriptions for Fraudulent Equipment that were never authorized by the Referring Providers whose names were on the prescription forms because the unidentifiable third-party individuals either modified prescriptions purportedly issued by the Referring Providers by including additional pieces of Fraudulent Equipment or created a new prescription for Fraudulent Equipment.

182.    The unidentifiable third-party individuals were able to provide the Defendants with unauthorized prescriptions for Fraudulent Equipment because all prescriptions for DME or OD that came from the Fordham Road Clinic were funneled through the front desk personnel, without

any involvement by the Insureds, and then directly provided to the Defendants and other DME/OD suppliers as part of the predetermined fraudulent protocol and unlawful financial arrangements.

183.    As such, many of the prescriptions for Fraudulent Equipment originating from Fordham Road Clinic, which were used as the basis to submit many of the charges to GEICO identified in Exhibit "1", were never issued or authorized by the Referring Providers whose names are identified on the prescriptions.

184.    As part of the predetermined fraudulent protocol where the Insureds and other patients who treated at the Fordham Road Clinic were provided with prescriptions for Fraudulent Equipment, each Insured was provided with a prescription for multiple items of Fraudulent Equipment after undergoing a purported initial examination at the Fordham Road Clinic.

185.    In keeping with the fact that the prescriptions issued to the Insureds subsequent to their initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, the Referring Providers who purportedly issued the prescriptions never evaluated each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

186.    In keeping with the fact that the prescriptions issued at the Fordham Road Clinic subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination at the Fordham Road Clinic received a prescription purportedly issued by David Minozzi, D.C. ("Minozzi"), for virtually the same type of Fraudulent Equipment.

187.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the Fordham Road

Clinic, Minozzi's name was used to virtually always prescribe the following Fraudulent Equipment to every Insured identified in Exhibit "1" that treated at the Fordham Road Clinic: (i) a bed board; (ii) a cervical pillow; (iii) a mattress; (iv) a LSO; and (v) a lumbar cushion.

188.    In addition to the five items described above, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Fordham Road Clinic were fraudulently issued without authorization by the Referring Providers, Minozzi's name was virtually always used to issue a second prescription for a water circulating heat pad with pump on the same date as the prescription for Fraudulent Equipment after an initial examination.

189.    To the extent that the Insureds identified in Exhibit "1" returned to the Fordham Road Clinic and purportedly underwent follow-up examinations or treatment, the Insureds would frequently be provided at least one additional prescription for virtually identical Fraudulent Equipment purportedly issued by the Referring Providers and then provided to the Defendants or other DME/OD providers.

190.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, the Insureds identified in Exhibit "1" that continued treatment at the Fordham Road Clinic were virtually always prescribed at least one of the following four preset prescriptions for Fraudulent Equipment: (i) an EMS unit, an EMS support, a massager, an infrared lamp, and a whirlpool; (ii) a cervical traction unit; (iii) a LSO APL; and/or (iv) a Knee Orthosis (Custom Fitted).

191.    In further keeping with the fact that the prescriptions for Fraudulent Equipment at the Fordham Road Clinic were provided pursuant to a predetermined fraudulent protocol, every prescription for an EMS unit, an EMS support, a massager, an infrared lamp, and a whirlpool was

virtually always purportedly issued by Rivka Weiss, N.P. ("Weiss"). Similarly, virtually every prescription at the Fordham Road Clinic for a Knee Orthosis (Custom Fitted) was purportedly issued by Weiss.

192.    Also, and in keeping with the fact that the fact that the prescriptions for Fraudulent Equipment at the Fordham Road Clinic were pursuant to a predetermined fraudulent protocol, virtually every prescription from the Fordham Road Clinic for a cervical traction unit or LSO APL was purportedly issued by Minozzi

193.    When the Insureds identified in Exhibit "1" were prescribed Fraudulent Equipment while they continued treatment at the Fordham Road Clinic , and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Fordham Road Clinic were fraudulently issued without authorization by the Referring Providers, the Insureds were frequently provided with multiple prescriptions for Fraudulent Equipment purportedly issued on a single date, including prescriptions issued by the same Referring Provider.

194.    Upon information and belief, multiple separate prescriptions were issued to Insureds on a single date as part of the scheme between the Defendants and unidentifiable third-party individuals to provide the Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to lower the amount charged to GEICO on each bill so the Defendants could avoid detection of their fraudulent schemes.

195.    In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, there was no legitimate reason for a single Referring Provider to issue multiple prescriptions for Fraudulent Equipment to a single Insured on the same date when these multiple

prescriptions were provided to the Defendants. The multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription.

196.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Fordham Road Clinic were fraudulently issued without authorization by the Referring Providers, issued as part of a predetermined fraudulent protocol, and issued without medical necessity, the prescriptions for Fraudulent Equipment issued when the Insureds purportedly continued treatment at the Fordham Road Clinic were frequently issued on days that the Insureds were not examined or otherwise treated by the Referring Providers who purportedly issued the prescriptions.

197.    There is no legitimate reason why a substantial amount of the Insureds identified in Exhibit "1" who treated at the Fordham Road Clinic were issued prescriptions for Fraudulent Equipment pursuant to the pattern identified above.

198.    For example:

(i)     On December 15, 2018, an Insured named LJ was purportedly involved in a motor vehicle accident. LJ purportedly started treating at the Fordham Road Clinic with Minozzi on December 28, 2018.  On January 10, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of LJ that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump.  On January 24, 2019, Weiss's name was used to issue a prescription for a Knee Orthosis (Custom Fitted) in the name of LJ that was provided to the Defendants, despite Weiss not performing any examination or treatment on LJ on that day.  On February 6, 2019, Weiss's name was used to issue the following prescription in the name of LJ that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool, despite Weiss not performing any examination or treatment on LJ on that day.

(ii)    On January 12, 2019, an Insured named RF was purportedly involved in a motor vehicle accident. RF purportedly started treating at the Fordham Road Clinic with Minozzi on January 14, 2019.  On January 16, 2019 Minozzi's name was used to issue the following two separate prescriptions

in the name of RF that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump.  On February 11, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a Cervical Traction Unit in the name of RF that was provided to the Defendants. On February 25, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a LSO APL (Custom Fitted) in the name of RF that was provided to the Defendants. On April 4, 2019, Weiss's name was used to issue the following prescription in the name of RF that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool, despite Weiss not performing any examination or treatment on RF on that day.

(iii)    On January 24, 2019, an Insured named IA was purportedly involved in a motor vehicle accident. IA purportedly started treating at the Fordham Road Clinic with Minozzi on February 7, 2019.  On February 8, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of IA that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump. On March 7, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a Cervical Traction Unit in the name of IA that was provided to the Defendants.  Also on March 7, 2019, Weiss's name was used to issue a prescription for a Knee Orthosis (Custom Fitted) in the name of IA that was provided to the Defendants, despite Weiss not performing any examination or treatment on IA on that day.  On March 13, 2019, the same day that Weiss purportedly conducted a follow-up examination, Weiss's name was used to issue the following prescription in the name of IA that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool.  On April 17, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a LSO APL (Custom Fitted) in the name of IA that was provided to the Defendants.

(iv)    On February 5, 2019, an Insured named SJ was purportedly involved in a motor vehicle accident. SJ purportedly started treating at the Fordham Road Clinic with Minozzi on February 6, 2019.  On February 8, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of SJ that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump.  On February 21, 2019, Minozzi's name was used to issue two separate prescriptions in the name of SJ that were provided to the Defendants for: (i) a Cervical Traction

Unit; and (ii) a LSO APL (Custom Fitted), despite Minozzi not performing any examination or treatment on SJ on that day.  On March 26, 2019, the same day that Weiss purportedly conducted a follow-up examination, Weiss's name was used to issue the following prescription in the name of SJ that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool.

(v)      On February 23, 2019, an Insured named OJ was purportedly involved in a motor vehicle accident. OJ purportedly started treating at the Fordham Road Clinic with Minozzi on March 26, 2019.  On April 3, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of OJ that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump. On April 17, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a Cervical Traction Unit in the name of OJ that was provided to the Defendants.  On the same day, Weiss's name was used to issue a prescription for a Knee Orthosis (Custom Fitted) in the name of OJ that was provided to the Defendants, despite Weiss not performing any examination or treatment on OJ on that day.  On May 1, 2019, Weiss's name was used to issue another the following prescription in the name of OJ that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool, despite Weiss not performing any examination or treatment on OJ on that day.

(vi)     On March 1, 2019, an Insured named KL was purportedly involved in a motor vehicle accident. KL purportedly started treating at the Fordham Road Clinic with Minozzi on March 13, 2019.  On March 15, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of KL that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump. On April 2, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a Cervical Traction Unit in the name of KL that was provided to the Defendants.  On April 9, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a LSO APL (Custom Fitted) in the name of KL that was provided to the Defendants. On the same day, Weiss's name was used to issue a prescription for a Knee Orthosis (Custom Fitted) in the name of KL that was provided to the Defendants, despite Weiss not performing any examination or treatment on KL on that day.  On April 17, 2019, Weiss's name was used to issue the following prescription in the name of KL that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and

(v) a whirlpool, despite Weiss not performing any examination or treatment on KL on that day.

(vii)   On March 15, 2019, an Insured named KH was purportedly involved in a motor vehicle accident. KH purportedly started treating at the Fordham Road Clinic with Minozzi on April 3, 2019.  On April 11, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of KH that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump.  On April 22, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue two separate prescriptions in the name of KH for: (i) a Cervical Traction Unit; and (ii) a LSO APL (Custom Fitted) that were provided to the Defendants. On May 30, 2019, Weiss's name was used to issue the following prescription in the name of KH that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool, despite Weiss not performing a follow-up examination or any other service on KH on that day.

(viii)  On March 19, 2019, an Insured named MA was purportedly involved in a motor vehicle accident. MA purportedly started treating at the Fordham Road Clinic with Minozzi on April 1, 2019.  On April 18, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of MA that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump.  On April 18, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a Cervical Traction Unit in the name of MA that was provided to the Defendants. Also on April 18, 2019, Weiss's name was used to issue a prescription for a Knee Orthosis (Custom Fitted) in the name of MA that was provided to the Defendants, despite Weiss not performing any examination or treatment on MA on that day.  On May 8, 2019, Weiss's name was used to issue the following prescription in the name of MA that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool, despite Weiss not performing any examination or treatment on MA on that day.

(ix)    On March 29, 2019, an Insured named DO was purportedly involved in a motor vehicle accident. DO purportedly started treating at the Fordham Road Clinic with Minozzi on March 29, 2019.  On April 9, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of DO that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump.  On April 18, 2019, following treatment at the Fordham Road Clinic with Minozzi

Minozzi's name was used to issue two separate prescriptions in the name of DO that were provided to the Defendants for: (i) a Cervical Traction Unit; and (ii) a LSO APL (Custom Fitted). On May 8, 2019, Weiss's name was used to issue the following prescription in the name of DO that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool, despite Weiss not performing any examination or treatment on DO on that day.

(x)     On April 9, 2019, an Insured named BM was purportedly involved in a motor vehicle accident. BM purportedly started treating at the Fordham Road Clinic with Minozzi on April 18, 2019. On April 18, 2019 Minozzi's name was used to issue the following two separate prescriptions in the name of BM that were provided to the Defendants: (i) a prescription for a bed board, a cervical pillow, a mattress, a LSO, and a lumbar cushion; and (ii) a prescription for a water circulating heat pad with pump. On May 2, 2019, following treatment at the Fordham Road Clinic with Minozzi, Minozzi's name was used to issue a prescription for a LSO APL (Custom Fitted) in the name of BM that was provided to the Defendants. On May 22, 2019, Weiss's name was used to issue the following prescription in the name of BM that was provided to the Defendants: (i) an EMS unit; (ii) an EMS support; (iii) a massager; (iv) an infrared lamp; and (v) a whirlpool, despite Weiss not performing any examination or treatment on BM on that day.

199.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Fordham Road Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

200.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Fordham Road Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Fordham Road Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

201.    Further, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Fordham Road Clinic were not medically necessary, were provided pursuant to a predetermined fraudulent protocol, and were never

authorized or issued by the Referring Providers, the Referring Providers who purportedly issued the prescriptions for Fraudulent Equipment virtually never had contemporaneously dated medical records, such as an examination report, that identified the Fraudulent Equipment listed on the prescriptions that the Defendants used to support the charges identified in Exhibit "1".

202.   For example, prescriptions for Fraudulent Equipment issued to Insureds on the same date that the Insureds underwent initial examinations at the Fordham Road Clinic were purportedly issued by Minozzi when – to the extent that Minozzi treated the Insureds on that date – Minozzi's contemporaneously dated medical records did not identify or explain why any of the Fraudulent Equipment was prescribed. However, contemporaneously dated medical records purportedly written by Weiss identified the Fraudulent Equipment purportedly prescribed to Insureds by Minozzi when Weiss did not issue the prescriptions to the Insureds.

203.   Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Fordham Road Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous medical records did not contain any sufficient information to explain why any of the Fraudulent Equipment was prescribed.

204.   To the extent that the contemporaneous reports issued by Referring Providers at the Fordham Road Clinic did reference any of the Fraudulent Equipment prescribed, the medical records virtually never contained any specific detail explaining why the Fraudulent Equipment was prescribed to the Insured.

205.   Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the Referring Providers' follow-up

54

examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

206.    Even more, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, when the Insureds continued to seek treatment at the Fordham Road Clinic, the follow-up examination reports generated by the Referring providers virtually never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

207.    Additionally, the prescriptions purportedly issued by Referring Providers at the Fordham Road Clinic were never given to the Insureds but were routed directly to the Defendants and other DME/OD suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Fordham Road Clinic, without any interaction with or instruction concerning their use from the Defendants, other DME/OD suppliers, or a healthcare provider.

208.    Also as part of the fraudulent scheme at the Fordham Road Clinic, the prescriptions purportedly issued by the Referring Providers were purposefully generic and vague to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

209.    By way of example, rather than specifying the type of lumbosacral or knee orthosis or  that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – the prescriptions purporting to be

55

issued by the Referring Providers at the Fordham Road Clinic, including Minozzi and Weiss, simply issued prescriptions containing the phrases "LSO" and "K.O. (Custom Fitted)" with the intent of enabling the Defendants to select a specific type of support that was more highly priced and profitable, instead of issuing prescriptions for support braces that were actually needed, to the extent support braces were actually needed in the first instance.

> **3)** **The Predetermined Fraudulent Protocol at the Graham Ave and East New York Ave Clinics**

210.    In addition to the Church Ave Clinic and the Fordham Road Clinic, the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to identical predetermined fraudulent protocols at the Graham Ave Clinic and East New York Ave Clinic (collectively the "Davis Clinics").

211.    Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Davis Clinics were purportedly provided with initial examinations from Gordon Davis, D.O. ("Davis"). After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment, similar to the Church Ave and Fordham Road Clinics.

212.    When the Insureds sought treatment with and were purportedly provided with an initial evaluation Davis at the Davis Clinics, Davis did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

213.    Rather, Davis purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

214. In keeping with the fact that the prescriptions purportedly issued by Davis at the Davis Clinics subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination at either of the Davis Clinics received a prescription for virtually the same type of Fraudulent Equipment.

215. Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination, Davis virtually always purportedly prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that they treated: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress.

216. To the extent that the Insureds identified in Exhibit "1" returned to the Davis Clinics and purportedly underwent follow-up examinations or treatments, the Insureds would virtually always be provided with at least one or more additional prescriptions for a predetermined set of Fraudulent Equipment purportedly issued by Davis and then provided to the Defendants or other DME/OD suppliers.

217. Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, Davis virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that continued treating at the Davis Clinics: (i) a "TENS/EMS" unit; (ii) a "TENS/EMS" belt; (iii) a TENS accessory kit: (iv) an infrared heating lamp; and (v) a massager.

218.   In addition to the items prescribed to virtually every Insured after a purported follow-up examination, Davis purportedly provided separate additional prescriptions for Fraudulent Equipment that virtually always included at least one of following: (i) a custom fitted lumbar orthotic; (ii) cervical traction equipment; and/or (iii) a shoulder support.

219.   In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided to the Defendants pursuant to a predetermined fraudulent protocol, without any legitimate reason, Davis would issue multiple prescriptions for Fraudulent Equipment to a single Insured on the same date when all the prescriptions were provided to the Defendants.

220.   In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by Davis pursuant to a predetermined fraudulent protocol, the prescriptions for a custom fitted lumbar orthotic, a cervical traction unit, or a shoulder support were frequently dated on a day that the Insureds was not examined or otherwise treated by Davis.

221.   For example:

(i)     On January 20, 2019, an Insured named CA was purportedly involved in a motor vehicle accident. CA purportedly started treating at the East New York Ave Clinic on or around January 21, 2019. After Davis purportedly performed an initial examination on CA, Davis purportedly issued a prescription in the name of CA that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress. On February 13, 2019, following a purported visit with Davis, Davis purportedly issued two separate prescriptions in the name of CA for: (i) cervical traction equipment; and (ii) a LSO APL Custom Fitted that were provided to the Defendants.  On February 18, 2019, the same day that Davis purportedly conducted a follow-up examination, Davis purportedly issued the following prescription in the name of CA that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager. On February 25, 2019, Davis purportedly issued a prescription in the name

of CA for a shoulder support that was provided to the Defendants, despite Davis not performing a follow-up examination or any other service on CA on that day.

(ii)    On February 28, 2019, an Insured named AA was purportedly involved in a motor vehicle accident. AA purportedly started treating at the Graham Ave Clinic on or around March 14, 2019. After Davis purportedly performed an initial examination on AA, Davis purportedly issued a prescription in the name of AA that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress. On April 5, 2019, Davis purportedly issued three separate prescriptions in the name of AA for: (i) cervical traction equipment; (ii) a LSO APL Custom Fitted; and (iii) a shoulder support that were provided to the Defendants, despite Davis not performing a follow-up examination or any other service on AA on that day. On April 25, 2019, the same day that Davis purportedly conducted a follow-up examination, Davis purportedly issued the following prescription in the name of AA that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager.

(iii)    On March 5, 2019, an Insured named HA was purportedly involved in a motor vehicle accident. HA purportedly started treating at the East New York Ave Clinic on or around March 6, 2019. After Davis purportedly performed an initial examination on HA, Davis purportedly issued a prescription in the name of HA that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress. On March 27, 2019, Davis purportedly issued two separate prescriptions in the name of HA for: (i) cervical traction equipment; and (ii) a LSO APL Custom Fitted that were provided to the Defendants, despite Davis not performing a follow-up examination or any other service on HA on that day. On April 10, 2019, the same day that Davis purportedly conducted a follow-up examination, Davis purportedly issued the following prescription in the name of HA that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager.

(iv)    On March 5, 2019, an Insured named LM was purportedly involved in a motor vehicle accident. LM purportedly started treating at the East New York Ave Clinic on or around March 13, 2019. After Davis purportedly performed an initial examination on LM, Davis purportedly issued a prescription in the name of LM that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and

(vi) a dry pressure mattress. On April 10, 2019, the same day that Davis purportedly conducted a follow-up examination, Davis purportedly issued the following prescription in the name of LM that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager. On April 29, 2019, following a purported follow-up visit with Davis, Davis purportedly issued two separate prescriptions in the name of LM for: (i) a LSO APL Custom Fitted; and (ii) a knee support that were provided to the Defendants.

(v)     On March 20, 2019, an Insured named SB was purportedly involved in a motor vehicle accident. SB purportedly started treating at the East New York Ave Clinic on or around March 28, on 2019. After Davis purportedly performed an initial examination on SB, Davis purportedly issued a prescription in the name of SB that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress. On April 17, 2019, Davis purportedly issued two separate prescriptions in the name of SB for: (i) cervical traction equipment; and (ii) a LSO APL Custom Fitted that were provided to the Defendants, despite Davis not performing a follow-up examination or any other service on SB on that day. On April 29, 2019, Davis purportedly issued a prescription in the name of SB for a shoulder support that was provided to the Defendants, despite Davis not performing a follow-up examination or any other service on SB on that day. On May 22, 2019, Davis purportedly issued the following prescription in the name of SB that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager, despite Davis not performing a follow-up examination or any other service on SB on that day.

(vi)    On March 20, 2019, an Insured named SJ was purportedly involved in a motor vehicle accident. SJ purportedly started treating at the Graham Ave Clinic on or around April 3, 2019. After Davis purportedly performed an initial examination on SJ, Davis purportedly issued a prescription in the name of SJ that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress. On April 18, 2019, Davis purportedly issued three separate prescriptions in the name of SJ for: (i) cervical traction equipment; (ii) a LSO APL Custom Fitted; and (iii) a shoulder support that were provided to the Defendants, despite Davis not performing a follow-up examination or any other service on SJ on that day. On May 28, 2019, the same day that Davis purportedly conducted a follow-up examination, Davis purportedly issued the following prescription in the name of SJ that was provided to the

Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager.

(vii)  On March 29, 2019, an Insured named EA was purportedly involved in a motor vehicle accident. EA purportedly started treating at the Graham Ave Clinic on or around April 2, 2019. After Davis purportedly performed an initial examination on EA, Davis purportedly issued a prescription in the name of EA that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress.  On April 18, 2019, Davis purportedly issued two separate prescriptions in the name of EA for: (i) cervical traction equipment; and (ii) a LSO APL Custom Fitted that were provided to the Defendants, despite Davis not performing a follow-up examination or any other service on EA on that day.  On May 2, 2019, Davis purportedly issued a prescription in the name of EA for a shoulder support that was provided to the Defendants, despite Davis not performing a follow-up examination or any other service on EA on that day.  On May 4, 2019, Davis purportedly issued the following prescription in the name of EA that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager, despite Davis not performing a follow-up examination or any other service on EA on that day.

(viii)  On April 12, 2019, an Insured named AP was purportedly involved in a motor vehicle accident. AP purportedly started treating at the Graham Ave Clinic on or around April 12, 2019. After Davis purportedly performed an initial examination on AP, Davis purportedly issued a prescription in the name of AP that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress. On May 17, 2019, the same day that Davis purportedly conducted a follow-up examination, Davis purportedly issued the following prescription in the name of AP that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager.  On May 30, 2019, Davis purportedly issued three separate prescriptions in the name of AP for: (i) cervical traction equipment; (ii) a LSO APL Custom Fitted; and (iii) a shoulder support that were provided to the Defendants, despite Davis not performing a follow-up examination or any other service on AP on that day.

(ix)  On September 16, 2019, an Insured named BG was purportedly involved in a motor vehicle accident. BG purportedly started treating at the East New York Ave Clinic on or around October 2, 2019. After Davis purportedly performed an initial examination on BG, Davis purportedly issued a

prescription in the name of BG that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress. On October 30, 2019, following a purported follow-up visit with Davis, Davis purportedly issued two separate prescriptions in the name of BG for: (i) cervical traction equipment; and (ii) a LSO APL Custom Fitted that were provided to the Defendants. On December 4, 2019, the same day that Davis purportedly conducted a follow-up examination, Davis purportedly issued the following prescription in the name of BG that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager.

(x)    On October 2, 2019, an Insured named KL was purportedly involved in a motor vehicle accident. KL purportedly started treating at the East New York Ave Clinic on or around October 17, 2019. After Davis purportedly performed an initial examination on KL, Davis purportedly issued a prescription in the name of KL that was provided to the Defendants for the following Fraudulent Equipment: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacrum orthosis; (iv) a lumbar cushion; (v) a bed board; and (vi) a dry pressure mattress. On October 30, 2019, following a purported follow-up visit with Davis, Davis purportedly issued two separate prescriptions in the name of KL for: (i) cervical traction equipment; and (ii) a LSO APL Custom Fitted that were provided to the Defendants. On December 30, 2019, the same day that Davis purportedly conducted a follow-up examination, Davis purportedly issued the following prescription in the name of KL that was provided to the Defendants: (i) a TENS/EMS Unit; (ii) a TENS/EMS belt; (iii) a TENS accessory kit; (iv) an infrared heating lamp; and (v) a massager

222.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Davis Clinics were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol established at the Davis Clinics.

223.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Davis Clinics were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Davis Clinics received multiple prescriptions for virtually the same type of Fraudulent Equipment,

similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

224.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Davis Clinics were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneous dated medical records, such as an initial examination report or a follow-up examination report, virtually never identified all of the Fraudulent Equipment purportedly prescribed to the Insureds.

225.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Davis Clinics were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports did not contain any sufficient information to explain why any of the Fraudulent Equipment was prescribed.

226.    For example, at the Davis Clinics, Davis used preprinted template-based reports for patient evaluations whereby Davis would fill-in the blanks to purportedly notate an evaluation. The template-based reports contained a section for "Surgical Supplies" with items listed to be circled if prescribed and a blank space for "Other" items to be prescribed. However, in virtually every case where a prescription from the Davis Clinics was used by the Defendants to submit the charges contained in Exhibit "1", any existing evaluation report that was contemporaneously dated with a prescription for Fraudulent Equipment did not circle or otherwise identity in the "Surgical Supplies" section all of the Fraudulent Equipment purportedly prescribed by Davis.

227.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the Referring Providers' follow-up

examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

228.    Even more, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, when the Insureds continued to seek treatment at the Davis Clinics, the follow-up examination reports generated by Davis virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

229.    Additionally, as part of the fraudulent scheme, the prescriptions issued by Referring Providers at the Davis Clinic were never given to the Insureds but were routed directly to the Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Davis Clinics, without any interaction with or instruction concerning their use from either the Defendants or a healthcare provider.

230.    Also as part of the fraudulent scheme, the prescriptions purportedly issued by the Referring Providers at the Davis Clinics were purposefully generic and vague, which allowed the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

231.    By way of example, prescriptions purportedly issued by Davis from the East New York Ave Clinic contained prescriptions for "TENS Unit/E.M.S", which are two separate items that perform extremely different functions. An EMS unit is for muscle stimulation to decrease muscle spasms or promote muscle growth, while a TENS unit is for nerve stimulation to assist

with pain management. In addition, prescriptions purportedly issued by Davis from the Davis Clinics never specified the type of lumbar sacrum orthosis or cervical collar that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code. Instead, Davis simply issued prescriptions containing the phrase "lumbar sacrum orthosis" and "cervical collar" with the intent of enabling the Defendants to select a specific type of lumbar brace and cervical collar that was more highly priced and profitable.

**D.    The Unlawful Distribution of Fraudulent Equipment to Insureds by the Defendants Without Valid Prescriptions**

232.    Cavallaro is not a licensed medical professional corporation, and Ovsyannikov is not a licensed healthcare provider. As such, the Defendants were not lawfully permitted to prescribe DME and OD to Insureds. For the same reason, the Defendants cannot properly dispense DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME and/or OD to be provided.

233.    However, in many of the fraudulent claims identified in Exhibit "1", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider, to the extent that they actually provided any DME or OD to the Insureds.

234.    More specifically, the prescriptions for DME and/or OD purportedly issued by the Referring Providers and provided to the Defendants were vague and generic because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

235.     Even more, in many of the fraudulent claims identified in Exhibit "1", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider because the Defendants provided Fraudulent Equipment that was not identified on the prescription.

236.     The vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided the Defendants the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule, as part of their scheme with others who are presently unidentifiable.

237.     In a legitimate clinical setting, a DME/OD retailer would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements in order to dispense the appropriate DME and/or OD prescribed to each patient.

238.     Upon information and belief, the Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid Fee Schedule.

239.     For example, Defendants regularly submitted bills to GEICO that were based upon prescriptions purportedly issued by Davis from the East New York Ave Clinic that identified prescriptions for "TENS Unit/E.M.S", which are two separate items that perform extremely different functions and have different reimbursement rates. An EMS unit is for muscle stimulation to decrease muscle spasms or promote muscle growth while a TENS unit is for nerve stimulation to assist with pain management.

240.    Based upon prescriptions from Davis from the Davis Clinics, the Defendants billed GEICO for TENS Units using HCPCS Code E0730 at a rate of $76.25 per unit.

241.    As the prescriptions issued from the Davis Clinics, did not identify the to the Defendants specifically items were determined by a healthcare provider to be medically necessity, and, as such, could not be used as a basis to provide DME to Insureds, to the extent that the Defendants actually provided any equipment.

242.    Another example where the Defendants improperly decided what DME/OD to provide Insureds – to the extent any items were actually provided – without a valid definitive prescription from a licensed healthcare provider involved, as shown above, every prescription containing a vague description of a "lumbar sacrum orthosis", "lumbosacral support (LSO)", or "LSO". These descriptions correspond to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

   (i)      HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

   (ii)     HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

   (iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

   (iv)     HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

   (v)      HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

   (vi)     HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)  HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $ 806.64.

(viii)  HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix)  HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)  HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)  HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)  HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii)  HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)  HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv)  HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)  HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)  HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii)  HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)   HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)   HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii)   HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

243.   As unlicensed healthcare providers, the Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a ""lumbar sacrum orthosis", "lumbosacral support (LSO)", or "LSO".

244.   However, upon information and belief, the Defendants never contacted the Referring Provider, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds based upon the vague and generic prescriptions for Fraudulent Equipment.

245.   In fact, each and every time that the Defendants received a prescription from the Referring Providers for a "lumbar sacrum orthosis", "lumbosacral support (LSO)", and "LSO", the Defendants billed GEICO using HCPCS Code L0627 requesting a reimbursement of $322.98, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

246.   The vague and generic descriptions that the Defendants used to bill for specific types of OD were not limited to lumbar orthotics. For example, the Defendants submitted bills to

GEICO containing charges based upon prescriptions for a "cervical collar" or "cervical collar (2 pcs)". Like the different types of lumbar orthotics, there are more than 12 different types of cervical collars, with five different type of "two-piece" collars, each with its own HCPCS Code and reimbursement amount.

247.   The Defendants were not legally permitted to determine which of the above-available options were medically necessity for each Insured based upon the vague prescriptions of "cervical collar" or "cervical collar (2 pcs)".

248.   However, each and every time that the Defendants received a prescription from the Referring Providers for a "cervical collar" or "cervical collar (2 pcs)", the Defendants billed GEICO using HCPCS Code L0180 requesting a reimbursement of $233.00, and thereby asserted that they provided the Insureds with that specific item.

249.   These are only representative examples. To the extent that the Defendants actually provided any Fraudulent Equipment, they unlawfully prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibit "1" that are based upon vague and generic prescriptions because the Defendants decided which specific items of DME and/or OD to provide the Insureds.

250.   The Fraudulent Equipment provided to the Insureds identified in Exhibit "1" – to the extent that the Fraudulent Equipment was actually provided – by the Defendants was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessity. Rather, the Fraudulent Equipment identified in Exhibit "1" were the result of decisions by the Defendants.

251.   In all of the claims identified in Exhibit "1" that were based upon vague and generic language contained in the prescriptions, the Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of PIP Benefits.

**E.      The Defendants' Fraudulent Billing for DME and/or OD**

252.   The bills submitted to GEICO and other New York automobile insurers by the Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

253.   In the bills and other documents submitted to GEICO, the Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between the Defendants and others who are not presently identifiable.

254.   In the bills and other documents submitted to GEICO, the Defendants also misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between the Defendants and others who are presently unidentifiable.

255.   Further, the Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by

licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

256. Moreover, and as explained below, the bills submitted to GEICO by the Defendants misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

257. Thereafter, in an attempt to conceal their scheme to fraudulently bill GEICO for DME/OD purportedly provided to GEICO's Insureds, the Defendants would submit multiple bills to GEICO for Fraudulent Equipment purportedly provided to a single Insured on the same day.

258. The Defendants regularly used prescriptions purportedly issued by the Referring Providers containing multiple items of Fraudulent Equipment and would submit two or more bills to GEICO for Fraudulent Equipment purportedly provided to Insureds based on a single prescription, when all of the Fraudulent Equipment billed to GEICO was issued to the Insured on the same day.

259. There is also no legitimate reason why the Defendants would submit multiple bills to GEICO for Fraudulent Equipment purportedly provided on a single date.

260. Upon information and belief, the Defendants split the Fraudulent Equipment purportedly provided to the Insureds on multiple bills in order to conceal the extent of the fraudulent charges billed to GEICO.

      **1)**       **The Defendants' Fraudulently Misrepresented the Fee Schedule items Purportedly Provided**

261.    When the Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

262.    As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

263.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

264.    By submitting bills to GEICO containing specific HCPCS Codes the Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

265.    However, with the exception of codes relating to positioning pillows/cushions under HCPCS Code E0190, in virtually all of the bills submitted to GEICO for Fee Schedule items, the Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

266.    The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Defendants' submitted bills to GEICO containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

267.    As indicated above, as part of the unlawful financial arrangements between the Defendants and others who are not presently identifiable, the Defendants were provided with prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent protocols, which provided the Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

268.    Accordingly, the Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

269.    Although several options were available to the Defendants based upon the vague and generic prescriptions, the Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

270.    However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

271.    As identified in the claims contained within Exhibit "1", the Defendants frequently submitted bills to GEICO for Fraudulent Equipment that was purportedly "custom fitted" for each Insured when – to the extent that the Fraudulent Equipment was actually provided to the Insureds – the Defendants never customized the Fraudulent Equipment as billed.

272.    For example, the Defendants used the vague and generic language in the prescriptions purportedly issued from the Referring Providers to bill GEICO for the following:  (i) a lumbar orthotic using HCPCS Code L0627 with a charge of $322.98 per unit; (ii) a knee orthotic

74

using HCPCS Code L1832 with a charge of $607.55; (iii) a shoulder orthotic using HCPCS Code L3671 with a charge of $477.00; (iv) a shoulder-elbow-wrist-hand orthotic using HCPCS Code L3960 with a charge of $372.50; and (v) a cervical collar using HCPCS Code L0180 with a charge of $233.00.

273.    However, the bills to GEICO for HCPCS Codes L0627, L1832, L3671, L3960, and L0180 fraudulently misrepresented the type of Fraudulent Equipment the Defendants purportedly provided to Insureds as the OD the Defendants provided – to the extent that the orthotics were actually provided – were not reimbursable under the specific HCPCS Codes billed to GEICO.

274.    The products assigned to HCPCS Codes L0627, L1832, L3671, L3960, and L0180 are different types of OD that are required to be customized to fit a specific patient by an individual with expertise.

275.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Codes L0627, L1832, L3671, L3960, and L0180, the specific orthotic provided by the Defendants – to the extent that the Defendants provided the Insureds with any OD – did not contain the requirements set forth in HCPCS Codes L0627, L1832, L3671, and L3960 because – at a minimum – the items were never customized to fit each patient.

276.    In keeping with the fact that the claims identified in Exhibit "1" for custom-fitted OD, including the claims for HCPCS Codes L0627, L1832, L3671, L3960, and L0180 fraudulently misrepresented that the Defendants satisfied all the requirements for the billed HCPCS Codes, upon information and belief, the Defendants did not, and could not have, custom-fitted the OD as required.

277.   To the extent that any of the charges identified in Exhibit "1" for custom-fitted OD, including the claims for HCPCS Codes L0627, L1832, L3671, L3960, and L0180, were provided, the Defendants never customized the equipment as required by Palmetto.

278.   In order to help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding -- Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

279.   One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

280.   By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or

physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

281.    In the claims identified in Exhibit "1" for custom-fitted OD, including the claims for HCPCS Codes L0627, L1832, L3671, L3960, and L0180, the Defendants fraudulently misrepresented that the Defendants provided the Insureds with OD that was custom-fitted as defined by Palmetto, by a certified orthotist.

282.    Instead, to the extent that the Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for HCPCS Codes L0627, L1832, L3671, L3960, and L0180, the Defendants dropped off the Fraudulent Equipment without taking any action to custom-fit the OD. To the extent that the Defendants attempted to make any adjustments to the Insureds identified in Exhibit "1" that received custom-fitted OD, the Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

283.    To the extent that Ovsyannikov had any interaction with the Insureds identified in Exhibit "1" regarding the OD billed to GEICO, Ovsyannikov would use the Insured's height and weight to determine the sizing of a brace (in a small, medium, large, or extra-large sizing scale) of an off-the-shelf brace, then adjust the straps to tighten the brace to the Insured. Such actions are consistent with minimal self-adjustment, as defined by Palmetto, and fail to comply with the requirements for HCPCS Codes containing a custom-fit requirement.

284.    In keeping with the fact that the Defendants misrepresented that they custom-fitted OD purportedly provided to Insureds and billed to GEICO, Ovsyannikov is not a certified orthotist and did not complete sufficient training to become a certified orthotist.

285.    In addition to submitting hundreds of fraudulent charges for custom-fitted OD, the Defendants fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits.

286.    The claims identified in Exhibit "1" for HCPCS Code E2602 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

287.    Each of the claims identified within Exhibit "1" for HCPCS Code E2602 contained a charge for $107.95 based upon a prescription for a "lumbar cushion."

288.    However, the product represented by HCPCS Code E2602 is defined as a wheelchair seat cushion that is greater than 22" in width.

289.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2602, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not cushions for use with a wheelchair.

290.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibit "1", who were provided with a cushion by the Defendants that was billed to GEICO under HCPCS Code E2602, were in a wheelchair.

291.    To the extent that any items were actually provided to the Insureds for the charges identified in Exhibit "1" under HCPCS Code E2602, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

292.    Unlike the fraudulent charges for $107.95 for each lumbar cushion billed under HCPCS Code E2602 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

293.    In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E2602, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment in response to a prescription for a wheelchair cushion and that item satisfies the requirements of HCPCS Code E2602.

294.    The claims identified in Exhibit "1" for HCPCS Code E0184 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

295.    Each of the claims identified within Exhibit "1" for HCPCS Code E0184 contained a charge for $153.13 based upon prescriptions for an "egg crate mattress" or "mattress".

296.    However, the product represented by HCPCS Code E1084 is defined as a dry pressure mattress, which is an actual mattress, not a mattress pad.

297.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0184, the items provided by the Suppler Defendants – to the extent that the Defendants

provided the Insureds with any item – were not dry pressure mattresses as required by HCPCS Code E0184.

298.    Upon information and belief, by contrast, to the extent that any items were provided, they were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code L0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

299.    Unlike the fraudulent charges for $153.13 for each egg crate mattress billed under HCPCS Code E0184 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code L0199.

300.    In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0184, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0184.

301.    The claims identified in Exhibit "1" for HCPCS Codes E0274 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

302.    Each of the claims identified within Exhibit "1" for HCPCS Code E0274 contained a charge for $101.00 based upon prescriptions for a "bed board."

303.    However, the product represented by HCPCS Code E0274 is defined as an over-bed table, and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

304.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0274, the items provided by the Suppler Defendants – to the extent that the Defendants provided the Insureds with any item – were not over-bed tables as required by HCPCS Code E0274.

305.    Upon information and belief, by contrast, to the extent that any items were provided, they were bed boards, or large, flat pieces of cardboard that are put under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

306.    In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0274, each of the bills fraudulently mispresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

307.    The claims identified in Exhibit "1" for HCPCS Code T5001 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

308.    Each of the claims identified within Exhibit "1" for HCPCS Code T5001 contained a charge for $195.00 based upon prescriptions for an "orthopedic car seat".

309.    However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons with special orthopedic needs, which is for persons who are unable to rely on their vehicles built-in restraint systems due to their special orthopedic needs.

310.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code T5001, the items provided by the Suppler Defendants – to the extent that the Defendants

provided the Insureds with any item – were not positioning seats for persons with special orthopedic needs, as required by HCPCS Code T5001.

311. Upon information and belief, by contrast, to the extent that any items were provided, they were seat pads or cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories.

312. Unlike the fraudulent charges for $195.00 for each "orthopedic car seat" billed under HCPCS Code T5001 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

313. In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code T5001, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code T5001.

314. With the exception of the claims identified using HCPCS Codes E0190, in each of the claims for Fee Schedule items identified within Exhibit "1", to the extent that any Fraudulent Equipment was actually provided, the Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and where therefore not eligible to collect No-Fault Benefits in the first instance.

2)    The Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

315.    When the Defendants' submitted bills to GEICO for Non-Fee Schedule items the Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

316.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

317.    By submitting bills to GEICO for Non-Fee Schedule items, the Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

318.    However, in virtually all of the charges to GEICO identified in Exhibit "1" for Non-Fee Schedule items, the Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

319.    Instead, the Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

320.    The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

321.    When the Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Defendants' acquisition cost of purportedly high-quality items. In actuality, the Defendants' legitimate acquisition cost for the low-quality items were significantly less.

322.    In an effort to further their scheme, upon information and belief, the Defendants, never researched the cost to the general public of the low-cost and low-quality Non-Fee Schedule items purportedly provided to the Defendants.

323.    Upon information and belief, the Defendants never researched the cost to the general public of the Non-Fee Schedule items that they purportedly provided because they knew that those items would be sold at significantly less than charges they submitted to GEICO, and other automobile insurers.

324.    In keeping with the fact that the Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

325.    Upon information and belief, the Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

326.    To the extent that the Defendants did submit invoices in conjunction with their bills to GEICO, upon information and belief, those invoices did not accurately represent the legitimate cost to acquire the Non-Fee Schedule items.

327.   As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibit "1" virtually always misrepresented the permissible reimbursement amount.

328.   For example, the Defendants billed GEICO for hundreds of infrared heat lamps under HCPCS Code E0205 with a charge of $210.00 or $223.44 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

329.   During GEICO's investigation into the Defendants, GEICO was able to observe the infrared heat lamps purportedly provided to the Insureds, which were billed under HCPCS Code E0205, and observed that the infrared heat lamps were low-quality items made in China. Upon further investigation, GEICO determined that the exact same low-quality model for the infrared heat lamps provided to Insureds were available for purchase to the general public on the internet on Ebay for between $9.95 to $19.99.

330.   In virtually all of the charges submitted to GEICO for infrared heat lamps, the Defendants fraudulently sought reimbursement for $210.00 or $223.44 per unit when the maximum reimbursement charge was no greater than the cost to the general public at a price of $19.99 per unit.

331.   Similarly, the Defendants billed GEICO for hundreds of water circulating heat pad with pump under HCPCS Code E0217 with a charge of $377.00 or $480.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

332.   During GEICO's investigation into the Defendants, GEICO was able to observe the water circulating heat pad with pumps purportedly provided to the Insureds, which were billed under HCPCS Code E0217, and observed that the water circulating pumps were low-quality items made in China. GEICO also determined that a virtually identical low-quality model for the water

circulating pumps provided to Insureds were available for purchase to the general public on the internet on eBay $19.99.

333.   In virtually all of the charges submitted to GEICO for a water circulating heat pad with pump, the Defendants fraudulently sought reimbursement for $377.00 or $480.00 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $19.99 per unit.

334.   The Defendants' also billed GEICO for hundreds of massagers under HCPCS Code E1399 with a charge of $175.00 or $195.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

335.   During GEICO's investigation into the Defendants, GEICO was able to observe the massagers purportedly provided to the Insureds, which was billed under HCPCS Code E1399, and observed that the massagers were low-quality items made in China. GEICO also determined that the exact same low-quality model massagers were available for purchase to the general public on the internet on eBay for $22.99.

336.   In virtually all of the charges submitted to GEICO for massagers, the Defendants fraudulently sought reimbursement for $175.00 or $195.00 per unit when the maximum reimbursement charge was no-greater than the cost to the general public at $22.99 per unit.

337.   The Defendants' billed GEICO for hundreds of portable whirlpools under HCPCS Code E1300 with a charge of $275.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

338.   During GEICO's investigation into the Defendants, GEICO was able to observe the portable whirlpools purportedly provided to the Insureds, which was billed under HCPCS Code E1300, and observed that the massagers were low-quality items made in China. GEICO also

determined that the exact same low-quality model portable whirlpools were available for purchase to the general public on the internet on ebay.com for $39.99 or on walmart.com for $44.99.

339.    In virtually all of the charges submitted to GEICO for portable whirlpools, the Defendants fraudulently sought reimbursement for $275.00 per unit when the maximum reimbursement charge was no-greater than the cost to the general public at $44.99 per unit.

340.    In each of the claims identified within Exhibit "1" for Non-Fee Schedule items, the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for Non-Fee Schedule items were the lesser of 150% of the acquisition cost or the cost to the general public, and where therefore not eligible to collect No-Fault Benefits in the first instance.

### III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

341.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Cavallaro, seeking payment for Fraudulent Equipment.

342.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

> (i)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amount for Non-Fee Schedule items identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

343.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

344.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

345.    Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – the result of unlawful financial arrangements, were provided to the Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

346.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were – not based upon medical

necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

347.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

348.    Even more, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

349.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

350.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.

351.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

352.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

353.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

354.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $584,000.00 based upon the fraudulent charges.

355.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Cavallaro**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

356.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 355 of this Complaint as if fully set forth at length herein.

357.    There is an actual case in controversy between GEICO and Cavallaro regarding more than $1,260,000.00 in fraudulent billing that has been submitted to GEICO in the name of Cavallaro.

358.    Cavallaro has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

359.    Cavallaro also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

360.    Cavallaro has no right to receive payment for any pending bills submitted to GEICO because Cavallaro purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

361.    Cavallaro has no right to receive payment for any pending bills submitted to GEICO because – to the extent Cavallaro actually provided any Fraudulent Equipment – Cavallaro fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

362.    Cavallaro has no right to receive payment for any pending bills submitted to GEICO because – to the extent Cavallaro provided any Fraudulent Equipment – Cavallaro fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

363.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Cavallaro.

### SECOND CAUSE OF ACTION
**Against Ovsyannikov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

364.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 355 of this Complaint as if fully set forth at length herein.

365.    Cavallaro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

366.    Ovsyannikov knowingly conducted and/or participated, directly or indirectly, in the conduct of Cavallaro's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for almost three years seeking payments that Cavallaro was not eligible to receive under the New York No-Fault Laws because: (i) Cavallaro submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Cavallaro submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – that are solely to financially enrich the Defendants and others who are not presently known; (iii) Cavallaro submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Cavallaro actually provided Fraudulent Equipment to the Insureds, the bills to

GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Cavallaro actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

367.    Cavallaro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Ovsyannikov operates Cavallaro, insofar as Cavallaro is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Cavallaro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Ovsyannikov continues to submit and attempt collection on the fraudulent billing submitted by Cavallaro to the present day.

368.    Cavallaro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Cavallaro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

369.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $584,000.00 pursuant to the fraudulent bills submitted through Cavallaro.

370.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Ovsyannikov and John Doe Defendants 1-10
### (Violation of RICO, 18 U.S.C. § 1962(d))

371.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 355 of this Complaint as if fully set forth at length herein.

372.    Cavallaro is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

373.    Ovsyannikov and John Doe Defendants 1-10 are owners of, employed by, or associated with the Cavallaro enterprise.

374.    Ovsyannikov and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Cavallaro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for almost three years seeking payments that Cavallaro was not eligible to receive under the New York No-Fault Laws because: (i) Cavallaro submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Cavallaro submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – that are solely to financially enrich the Defendants and others who are not presently known; (iii) Cavallaro submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Cavallaro actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently

mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Cavallaro actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

375.   Ovsyannikov and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

376.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $584,000.00 pursuant to the fraudulent bills submitted through Cavallaro.

377.   By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Cavallaro and Ovsyannikov
### (Common Law Fraud)

378.   GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 355 of this Complaint as if fully set forth at length herein.

379.   Cavallaro and Ovsyannikov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

380.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iii) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fee Schedule items accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fee Schedule items did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, the charges for Non-Fee Schedule items contained in the bills to GEICO misrepresented the permissible reimbursement amount.

381.    Cavallaro and Ovsyannikov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Cavallaro that were not compensable under the No-Fault Laws.

382.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $584,000.00 pursuant to the fraudulent bills submitted by the Defendants through Cavallaro.

383.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

384.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Cavallaro and Ovsyannikov**
**(Unjust Enrichment)**

385.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 355 of this Complaint as if fully set forth at length herein.

386.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

387.     When GEICO paid the bills and charges submitted by or on behalf of Cavallaro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

388.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

389.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

390.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $584,000.00.

### JURY DEMAND

391.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Cavallaro, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Cavallaro has no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of action against Ovsyannikov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $584,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Ovsyannikov and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $584,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Cavallaro and Ovsyannikov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $584,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Cause of Action against Cavallaro and Ovsyannikov, more than $584,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: December 6, 2021
       Uniondale, New York

RIVKIN RADLER LLP

By:_____
       Barry I. Levy (BL 2190)
       Michael A. Sirignano (MS 5263)
       Michael Vanunu (MV 4167)
       Philip P. Nash (PN 0519)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*